1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOEY JOHNSEN,

                    Plaintiff,

        v.

MICHAEL J. ASTRUE[1], Commissioner of
Social Security,

                    Defendant.

CASE NO.    C06-5654KLS

ORDER REMANDING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS

Plaintiff, Joey Johnson, has brought this matter for judicial review of the denial of his application for supplemental security income ("SSI") benefits.  The parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Magistrates Rule 13.  After reviewing the parties' briefs and the remaining record, the undersigned hereby finds and ORDERS as follows:

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 32 years old.[2] Tr. 24.  He has a general equivalency diploma and past work experience as a gardener, carnival barker and carnival ride operator. Tr. 20, 52, 57.

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue, who recently became acting Commissioner of Social Security, hereby automatically is substituted for Joanne B. Barnhart.

[2]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

ORDER
Page - 1

On August 20, 2003, plaintiff protectively filed an application for SSI benefits, alleging disability as of August 1, 2000, due to back pain and problems with his spine. Tr. 13, 46-47, 51.  His application was denied initially and on reconsideration. Tr. 24-25, 29, 34.  A hearing was held before an administrative law judge ("ALJ") on April 11, 2006, at which plaintiff, represented by counsel, appeared and testified, as did plaintiff's wife. Tr. 268-86.

On June 8, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)    at step one of the sequential disability evaluation process,[3] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)    at step two, plaintiff had "severe" impairments consisting of an annular tear of his cervical spine, a small lumbar disc extrusion, chronic left shoulder bursitis, and mental impairments;

(3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)    at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which precluded him from performing his past relevant work; and

(5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 15-23.  Plaintiff's request for review was denied by the Appeals Council on September 8, 2006, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 416.1481.

On November 8, 2006,[4] plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of

_____

[3]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

[4]As indicated herein, plaintiff's complaint was filed more than sixty days after the Appeals Council denied plaintiff's request for review.  A party may obtain judicial review of the Commissioner's final decision by commencing a civil action in federal court "within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 (claimant may file action in federal court within 60 days after the date notice of the Appeals Council's action is received); 20 C.F.R. § 404.982 (any party to Appeals Council's decision or denial of review may request time for filing action in federal court be extended).  This "sixty-day time limit is not jurisdictional, but is instead a statute of limitation which the Secretary may waive." Banta v. Sullivan, 925 F.2d 343, 345 (9th Cir. 1991).  As such, failure to file within the sixty-day time limit is an affirmative defense, which "is properly raised in a responsive pleading." Vernon v. Heckler, 811 F.2d 1274, 1278 (9th Cir. 1987) (citing Federal Rule of Civil Procedure 8(c)).  Because the Commissioner failed to raise the statute of limitations as an affirmative defense in her responsive pleading, the issue is waived, and the undersigned will deal with this matter on its merits.

benefits for the following reasons:

    (a)    the ALJ erred in evaluating the medical evidence in the record;

    (b)    the ALJ erred in assessing plaintiff's credibility;

    (c)    the ALJ erred in assessing plaintiff's residual functional capacity; and

    (d)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, hereby finds that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.    <u>The ALJ's Evaluation of the Medical Evidence in the Record</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." <u>Id.</u> at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

1   supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a

2   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

3   thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence."

4   <u>Sample</u>, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the

5   ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

6            The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

7   either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

8   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

9   legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the

10  ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739

11  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain

12  why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07

13  (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

14           In general, more weight is given to a treating physician's opinion than to the opinions of those who

15  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

16  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

17  "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190,

18  1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

19  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

20  opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may

21  constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-

22  31; <u>Tonapetyan</u>, 242 F.3d at 1149.

23           A.     <u>Dr. Luther</u>

24           Stevan Luther, M.D., completed a physical residual functional capacity questionnaire, dated March

25  17, 2006, in which he diagnosed plaintiff with chronic back pain and chronic headaches. Tr. 231.  These

26  diagnoses apparently were based on two contacts Dr. Luther had with plaintiff over the period of a month,

27  although no progress notes from those contacts are contained in the record. <u>Id.</u>  Dr. Luther also found that

28  depression and anxiety affected plaintiff's condition, and that the severity of his pain and other symptoms

1    would constantly interfere with concentration and attention needed to perform even simple work tasks. Tr.

2    232.  However, Dr. Luther felt he would be able to tolerate moderate work stress. Id.

3         Plaintiff further was found by Dr. Luther to be able to sit and stand for only 15 minutes at a time,

4    and sit, stand and walk for less than two hours in an eight-hour workday. Tr. 232-33.  According to Dr.

5    Luther, plaintiff also would need a job that permitted him to shift positions at will from sitting, standing or

6    walking, sometimes would need to take unscheduled breaks, and frequently would need to lie down. Tr.

7    233.  He could lift at most ten pounds occasionally, could rarely engage in such activities at looking down

8    and up, turning his head, twisting, stooping, crouching, and climbing, and on average would be absent from

9    work for more than four days per month. Tr. 233-34.

10        The ALJ accorded "no weight" to Dr. Luther's opinion, finding specifically as follows:

11        It is not supported by the medical record, and was prepared with the claimant present
          and is predicated on subjective issues and symptom magnification. See 2F/3.  There is no
12        longitudinal treatment history and no special expertise with respect to the claimant.

13   Tr. 18.  Plaintiff argues the ALJ is incorrect in finding no support for this opinion in the medical record, as

14   Dr. Luther specifically references certain MRI scans that were performed. See Tr. 231.  The only notes that

15   Dr. Luther included regarding such scans, however, is that they showed the presence of degenerative disc

16   disease in plaintiff's lumbar spine and the presence of an arachnoid cyst. Id.  There is no indication though

17   as to the nature or severity of these conditions.  Indeed, the electrodiagnostic studies that are contained in

18   the record, and the treatment progress notes that discuss them, largely reveal relatively mild findings with

19   respect to the above two conditions, and in themselves point to no significant work-related limitations. See

20   Tr. 192, 197, 199, 203-05, 210-11, 214-15, 218-19, 221-22, 238, 241, 257.

21        Plaintiff further argues that it is improper for an ALJ to reject a treating physician's opinion merely

22   due to the fact that it is based on a claimant's own self-reports and contains no objective medical findings.

23   There is nothing in the record, however, to indicate Dr. Luther is a treating physician, the only indication

24   that he actually saw, let alone examined, plaintiff come from his statement that contact was made two times

25   over a period of a month.  In addition, the Ninth Circuit Court of Appeals itself clearly has held that an ALJ

26   need not accept the opinion of even a treating physician, if it "is brief, conclusory, and inadequately

27   supported by clinical findings" or "by the record as a whole," and that a physician's opinion premised on a

28   claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the

1  claimant's credibility. <u>Batson</u>, 359 F.3d at 1195; <u>Thomas</u>, 278 F.3d at 957; <u>Tonapetyan</u>, 242 F.3d at 1149;

2  <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir. 1999).

3        Here, as discussed above and as properly found by the ALJ, Dr. Luther's opinion is brief, and for the

4  most part conclusory.  In any event, also as discussed above, it certainly is inadequately supported by

5  objective medical findings in the record.  As explained in greater detail below, furthermore, the ALJ also

6  properly discounted plaintiff's credibility.  For all of these reasons, therefore, the undersigned finds the ALJ

7  did not err in rejecting Dr. Luther's opinion.

8        B.     <u>Dr. Stickle</u>

9        On November 10, 2003, plaintiff was seen by his treating physician, H. Edwin Stickle, M.D., who

10  commented in relevant part as follows:

11        SSI is sending him to a chiropractor.  The issue that they raised is "there is nothing in his
          records that say he cannot work" and I would have to agree that issue has never been
12        documented as nobody in SSI or elsewhere actually have asked me if I thought he could
          work or not.  Reviewing the physiatrist note, there is no mention of that either.  His
13        training has been in the areas of carpentry, heavy equipment, setting up carnival rides,
          doing landscaping, etc.  These all involve physical labor, twisting, turning, standing, etc.
14        When he does try to stand for extended periods of time or sit, after 20 min he needs to
          change position to relieve discomfort.  The one thing that he would try as hard as he
15        possibly could to sit through would be going to Engineering school.  But it is hard to
          think of any other occupation that he could be retrained for that could accommodate his
16        need for frequent changes of position to relieve his chronic back discomfort.

17  Tr. 193.

18        The ALJ gave Dr. Stickle's opinion concerning plaintiff's ability to do other work "little weight,"

19  because it was "beyond his experience as a medical doctor," and because the "undercurrent" of his reports

20  indicated "some doubt on his part regarding the validity" of plaintiff's complaints. Tr. 18.  Plaintiff argues

21  the ALJ erred in rejecting Dr. Stickle's opinion regarding his need to change positions every 20 minutes,

22  asserting that this finding is consistent with the finding of Dr. Luther.  However, while Dr. Luther found

23  plaintiff needed to shift positions, he stated that such shifting would need to be "at will." Tr. 233.  In any

24  event, as discussed above, the ALJ properly rejected Dr. Luther's opinion.

25        The undersigned also finds that the ALJ did not err in rejecting Dr. Stickler's opinion concerning

26  plaintiff's ability to do other work for the reason that this area was beyond his expertise. <u>See</u> 20 C.F.R.

27  404.1527 (no special significance given to statements by medical sources on issues such as application of

28  vocational factors or whether or not claimant is disabled as statutorily defined).  On the other hand, the

ORDER
Page - 6

undersigned does find that the ALJ erred in not specifically dealing with Dr. Stickle's opinion on the issue of the need to shift every 20 minutes. Indeed, he appears not to have addressed this finding at all. To that extent, and because, as noted below, the ALJ did not adopt that restriction by implication by including it in his assessment of plaintiff's residual functional capacity, he erred.

C.   Dr. Koenig

Plaintiff was evaluated on November 18, 2003, by Elizabeth Koenig, M.D., who diagnosed him with the following conditions: probable attention deficit hyperactivity disorder, combined type; a history of conduct disorder; a pain disorder associated with psychological factors and unspecified general medical conditions; marijuana abuse; alcohol abuse in sustained full remission; and a likely borderline personality disorder. Tr. 188-89. She gave plaintiff a global assessment of functioning ("GAF") score of 42, indicating "[m]ajor impairment in occupational functioning," and concluded in relevant part that:

> It is likely that his mood instability is related to borderline personality disorder. He may also have a bipolar mood disorder. I think that there is a psychological overlay to the claimant's pain experience. This is not to say that he doesn't experience real pain. I suspect that he is more likely somatically focused when particularly depressed or stressed.

> Prognosis is fairly guarded. Individuals with his difficulties respond, somewhat variably to long-term psychotherapy. He expresses minimal interest in such treatment. He is quite against taking medications. I do think they might benefit him somewhat. I think his work pattern is unlikely to improve significantly anytime soon. . . . He is unlikely to maintain regular attendance with his current level of pain experience. . . .

Tr. 189-90.

With respect to Dr. Koenig's opinion, the ALJ found as follows:

> Dr. Koenig's opinion as to disability is based largely on the claimant's physical complaints, for which she has no support. She also noted that she felt medications would benefit the claimant, but that he was adamantly opposed to taking them. 5F/7-8. For these reasons, the undersigned gives Dr. Keonig's opinion some but not great weight. It is notable that she referred not to current level of pain, but "pain experience." I infer that there is meant to be some dubiousness attendant on this choice of terms.

Tr. 18. Plaintiff argues the ALJ was incorrect in finding Dr. Koenig's opinion was based largely on his physical complaints. The undersigned agrees. As noted above, Dr. Koenig clearly noted the presence of a "psychological overlay" to plaintiff's pain experience and that he was "more likely somatically focused when particularly depressed or stressed." Tr. 189.

Plaintiff also takes issue with the ALJ's statement that Dr. Koenig had no support for any findings she made based on his physical complaints, pointing out that she has the expertise to do so. Again, the

undersigned agrees.  Dr. Koenig, as a psychiatrist, is a licensed medical doctor, and thus is qualified to give opinions on the nature and impact of both physical and mental impairments and conditions.  Indeed, as a psychiatrist, Dr. Koenig likely is more qualified than the other physicians and psychologists in the record to opine on the interplay between plaintiff's physical and mental factors.  This was not a valid basis on which to reject her opinion concerning plaintiff's pain disorder, and to that extent, the ALJ again erred.

The other reasons the ALJ provided for rejecting Dr. Koenig's opinion also lack sufficient support.  For example, while it is true Dr. Koenig stated that plaintiff "might" benefit from taking medications, she stated he would benefit only "somewhat," and also noted that he was "unlikely to improve significantly anytime soon" with respect to his "work pattern."  Tr. 190.  The ALJ's statement that the reference to "pain experience" indicates some "dubiousness" on the part of Dr. Koenig is unpersuasive as well.  The ALJ gives no reason why the phrase "pain experience" is more suspect or less contemporaneous than the term "pain," particularly given the fact that, as discussed above, Dr. Koenig found plaintiff had a psychiatric component present.  Lastly, while the ALJ stated he was giving Dr. Koenig's opinion "some" weight, he does not specifically state what aspects of her opinion were being given weight.

II.     The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811,

818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

In this case, the ALJ discounted plaintiff's credibility in part on the basis of his failure to follow recommended treatment for his mental and physical impairments. Tr. 18. This is a valid basis on which to discount plaintiff's credibility. Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). For this reason alone, the ALJ did not err in finding plaintiff to be not fully credible.

Plaintiff argues, however, that it was improper for the ALJ to give this as a reason for discounting his credibility, in light of his past trouble with substance abuse. It is clear, however, that this stated reason for not taking medications is questionable at best, as noted by the ALJ:

> Despite his complaints of severe back and neck pain, he frequently refused prescription medications, allegedly due to his substance abuse history. 5F/3, 7-8; 6F/1. He refused epidural steroid injections, and likewise, he was not interested in physical therapy. 7F/2. However, he uses Vicodin to the extent it may have been retarding the success of treating his headaches. 8F/3-4.

Tr. 17. The record supports the ALJ in regard to this finding. See Tr. 191, 194, 196-97, 200-01, 210, 240, 244, 247, 251. 255. Indeed, plaintiff himself requested medication prescriptions and refills on more than one occasion (see Tr. 196, 214, 216, 250-52, 254-57), and the fact that plaintiff continued to use marijuana as a means of self-medication would seem to indicate substance abuse issues were not of particular concern to him (see Tr. 240).

The record further reveals that plaintiff was resistant to taking medications likely to help with his mental health issues as well. See Tr. 198-90. Even if plaintiff's stated reason for not taking medications – because of his substance abuse history – was believable, he offers no explanation as to why he refused, was not interested in, or failed to pursue non-medication treatment options, such as psychotherapy and physical therapy, as well. See Tr. 189, 243, 248. The stark inconsistency between plaintiff's stated reasons for not

1   taking mental health medications as recommended to him and the fact that he clearly continued to seek and

2   take serious pain and other medications alone is a valid reason for discounting his credibility.  As such, the

3   ALJ's credibility determination was proper.

4      It is true that the fact that a claimant does "not seek treatment for a mental disorder until late in the

5   day" is not a proper basis upon which to find a claimant not credible regarding that condition.  Nguyen v.

6   Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (noting that those with depression often do not recognize their

7   condition reflects potentially serious mental illness); see also Blankenship v. Bowen, 874 F.2d 1116, 1124

8   (6th Cir.1989) (holding invalid ALJ's rejection of claimant's assertions regarding his depression due to

9   failure to seek psychiatric treatment, and finding questionable practice of chastising one with mental

10  impairment for exercise of poor judgment in seeking rehabilitation).  Here, however, there is no indication

11  that plaintiff was unaware of his mental health issues, and, as noted above, was specifically advised that

12  treatment therefor would be helpful.  See Tr. 189-90.

13  III.  The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

14     If a disability determination "cannot be made on the basis of medical factors alone at step three of

15  the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

16  assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

17  claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

18  his or her past relevant work, and at step five to determine whether he or she can do other work.  Id.  It thus

19  is what the claimant "can still do despite his or her limitations." Id.

20     A claimant's residual functional capacity is the maximum amount of work the claimant is able to

21  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

22  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

23  limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

24  claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

25  related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

26  medical or other evidence." Id. at *7.

27     Here, the ALJ assessed plaintiff with the following residual functional capacity:

28     [T]he undersigned finds that the claimant has the residual functional capacity to perform
    light work.  He is able to lift 20 pounds occasionally, 10 pounds frequently, stand or

walk for about six hours, and sit for about six hours during an eight hour work day.  He
can do a job that involves only occasional climbing, balancing, stooping, kneeling,
crouching, or crawling activities, in an environment in which he does not have
concentrated exposure to vibration.  With respect to his mental abilities, he can maintain
social interaction with coworkers and supervisions [sic], manage superficial interaction
with the public, and perform all but detailed tasks or those requiring sustained
concentration.

Tr. 17.  In so finding, the ALJ accorded "significant weight" to the opinion of Alfred H. Dickson, M.D., a

non-examining consulting physician, who found plaintiff to have substantially similar physical functional

limitations.  See Tr. 19, 166-73.  As discussed above, the ALJ also rejected the opinions of both Dr. Luther

and Dr. Stickler.

Plaintiff argues the ALJ erred in giving significant weight to Dr. Dickson's opinion and not to those

of Drs. Luther and Stickler.  Plaintiff further argues Dr. Dickson's opinion is lacking in that it was made in

late October 2003, and thus Dr. Dickson did not have the benefit of any of the MRI scans performed.  First,

as discussed above, those MRI scans fail to show plaintiff experienced significant work-related limitations

as a result of his physical impairments demonstrated thereby.  Second, the fact that Dr. Dickson's opinion

differs from that of Dr. Luther's in certain respects is irrelevant, because, also as discussed above, the ALJ

properly rejected the latter physician's opinion.  On the other hand, because the ALJ erred in evaluating the

opinions of Drs. Stickler and Koenig regarding plaintiff's need to change positions and ability to maintain

regular attendance respectively, it is not clear all of his limitations were included in the ALJ's assessment of

his residual functional capacity.  To this extent, the ALJ erred as well.

Plaintiff further asserts that he suffers from additional limitations that were not included by the ALJ

in his residual functional capacity assessment.  For example, plaintiff points out that Dr. Luther indicated he

had more significant restrictions concerning sitting, standing and changing positions, and that he would need

to lie down frequently.  Again, however, because, as discussed above, the ALJ properly rejected the opinion

of Dr. Luther, he was not required to adopt the limitations contained therein.  His refusal to do so in this

instance, therefore, does not constitute error.  Plaintiff also argues that the ALJ should have obtained the

testimony of a vocational expert, but does not state why such testimony would be needed or required in

determining a claimant's residual functional capacity.[5]  This argument thus is rejected.

---

[5]To the extent plaintiff is arguing the ALJ should have called a vocational expert at step five of the sequential disability
evaluation process instead of relying solely on the Commissioner Medical-Vocational Guidelines, this issue is further addressed
in the next section below.

ORDER
Page - 11

Lastly, plaintiff argues the ALJ erred in failing to include a limitation that he is unable to maintain regular attendance at work.  It is not clear, however, that the ALJ was required to do so.  For example, once more as discussed above, the ALJ properly rejected the opinion of Dr. Luther, and thus was not required to adopt his specific finding that plaintiff would miss more than four days of work per month.  While, also as discussed above, the ALJ did err in evaluating Dr. Koenig's finding that plaintiff would unlikely be able to maintain regular attendance, she did not find for certain he would not be able to do so, nor did she find that he would miss more than four days per month as found by Dr. Luther.  In addition, Dr. Koenig found that mental health treatment was likely to be of at least some benefit to plaintiff.  Thus, the issue of the nature and extent of plaintiff's ability to maintain regular attendance has not yet been resolved.

## IV.    The ALJ's Step Five Analysis

If the claimant cannot perform his or her past relevant work at step four of the disability evaluation process, at step five, the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(d)-(e).  There are two ways that the ALJ can to this: "(a) by the testimony of a vocational expert, or (b) by reference to the [Commissioner's] Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2" (the "Grids"). Tackett, 180 F.3d at 1100-1101 (emphasis in original); see also Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  The ALJ's ability to rely on the Grids is limited, however, as noted by the Ninth Circuit in describing their purpose and function:

> In some cases, it is appropriate for the ALJ to rely on the Medical-Vocational Guidelines to determine whether a claimant can perform some work that exists in "significant numbers" in the national economy.  The Medical-Vocational Guidelines are a matrix system for handling claims that involve substantially uniform levels of impairment. . . .
>
> The Guidelines present, in *table form*, a short-hand method for determining the availability and numbers of suitable jobs for a claimant.  These tables are commonly known as "the grids."  The grids categorize jobs by their physical-exertional requirements and consist of three separate tables-one for each category: "[m]aximum sustained work capacity limited to sedentary work," "[m]aximum sustained work capacity limited to light work," and "[m]aximum sustained work capacity limited to medium work."[6] . . . Each grid presents various combinations of factors relevant to a claimant's ability to find work.  The factors in the grids are the claimant's age, education, and work experience.  For each combination of these factors, . . . the grids direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements.

---

[6]However, "[I]f a claimant is found able to work the full range of heavy work this is 'generally sufficient for a finding of not disabled.'" Tackett, 180 F.3d at 1101 n.5 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00).

1

> This approach allows the Commissioner to streamline the administrative process and encourages uniform treatment of claims. . . .

2

3

> The Commissioner's need for efficiency justifies use of the grids at step five where they *completely and accurately* represent a claimant's limitations. . . . In other words, a claimant must be able to perform the full range of jobs in a given category, i.e., sedentary work, light work, or medium work.

4

5   Tackett, 180 F.3d at 1101 (emphasis in original) (internal citations and footnote omitted).

6        If, on the other hand, a claimant has "significant non-exertional impairments," those impairments

7   "may make reliance on the grids inappropriate."[7] Id. at 1101-02; see also Osenbrock, 240 F.3d at 1162

8   (ALJ cannot rely on Grids where claimant has significant non-exertional impairments); Moore v. Apfel, 216

9   F.3d 864, 869 (9th Cir. 2000) (Grids inapplicable when they do not completely describe claimant's abilities

10  and limitations).  Proper use of the Grids depends in each case upon the nature and extent of the claimant's

11  impairments and limitations:

12

> The ALJ must apply the grids if a claimant suffers only from an exertional impairment . . . In such cases, the rule is simple: the grids provide the answer.  Where the grids dictate a finding of disability, the claimant is eligible for benefits; where the grids indicate that the claimant is not disabled, benefits may not be awarded.  However, where a claimant suffers solely from a nonexertional impairment . . . the grids do not resolve the disability question . . . other testimony is required.  In cases where the claimant suffers from both exertional and nonexertional impairments, the situation is more complicated.  First, the grids must be consulted to determine whether a finding of disability can be based on the exertional impairments alone. . . . If so, then benefits must be awarded.  However, if the exertional impairments alone are insufficient to direct a conclusion of disability, then further evidence and analysis are required.  In such cases, the ALJ must use the grids as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." . . . In short, the grids serve as a ceiling and the ALJ must examine independently the additional adverse consequences resulting from the nonexertionary impairment.

13

14

15

16

17

18

19

20

21  Cooper v. Sullivan, 880 F.2d 1152, 1155-56 (9th Cir. 1989) (internal citations and footnotes omitted).

22        Here, the ALJ found plaintiff's non-exertional "limitations would not have a significant effect" on his

23  ability to perform "unskilled work," and would "not significantly limit the range of work contemplated by

24  the Medical-Vocational Guidelines." Tr. 21.  The ALJ then found that the occupational base for light

25  unskilled work had not been significantly eroded by plaintiff's non-exertional limitations, and that plaintiff

26  was "not disabled" within the framework of Grid Rule 202.20. Tr. 22.  Plaintiff argues that because he has

27  _____

28      [7]"Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b).  "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

1  significant non-exertional limitations, it was improper for the ALJ to rely on the Grids alone as he did to

2  find him not disabled.  The undersigned agrees.

3         The Grids "are directly premised on the availability of jobs at the unskilled level," and "'reflect the

4  potential occupational base of *unskilled* jobs for individuals who have severe impairments which limit their

5  exertional capacities. . . .'" Ortiz v. Secretary of Health and Human Services, 890 F.2d 520, 526 (1st Cir.

6  1989) (quoting SSR 85-15, 1985 WL 56857 *1 (emphasis added by court of appeals)).  The Social Security

7  Regulations themselves "take explicit administrative notice of the existence of '[a]pproximately 1600

8  separate sedentary and light *unskilled* occupations," with "each occupation representing numerous jobs in

9  the national economy." Id. (quoting 20 C.F.R. Part 404, Subpart P, App. 2, § 202.00(a) (1988)) (emphasis

10 added by court of appeals).  As long as a non-exertional limitation is "substantially consistent with the

11 performance of the full range of unskilled work," therefore, the Grids retain their "relevance and the need

12 for vocational testimony is obviated." Id.

13        As noted above, the ALJ found plaintiff limited to work that involved "only occasional climbing,

14 balancing, stooping, kneeling, crouching, or crawling activities." Tr. 17.  Citing to SSR 83-12, 1983 WL

15 31253, SSR 83-14, 1983 WL 31254, and SSR 85-15, the ALJ also found these additional limitations had

16 "little or no effect on the occupational base of unskilled light work, as climbing, stooping, crouching, and

17 crawling limitations do not significantly erode the occupational base of light work." Tr. 20.  A limitation to

18 occasional kneeling also seems to "be of little significance" as well, SSR 85-15 recognizes that, contrary to

19 the ALJ's statement, at least some light category occupations may be ruled out by a limitation on climbing.

20 See 1985 WL 56857 *6.  This issue, therefore, should be addressed on remand.

21        The ALJ, in addition, limited plaintiff to jobs "in an environment in which" plaintiff "does not have

22 concentrated exposure to vibration," which the Social Security Rulings note may constitute a significant

23 non-exertional limitation as well. Tr. 17; see SSR 83-14, 1983 WL 31254 *2; SSR 85-15, 1985 WL 56857

24 *8.  The ALJ did not address this possibility.  As discussed above, furthermore, the ALJ erred in evaluating

25 Dr. Stickle's opinion regarding plaintiff's need to change positions.  This too is recognized in the Social

26 Security Rulings as potentially constituting a significant non-exertional limitation. See SSR 83-12, 1983 WL

27 31253 *4.  As such, if on remand the Commissioner determines that a need to change positions should be

28 included in plaintiff's residual functional capacity assessment, a determination shall be made as well at step

1    five as to its effect, if any, on the number of other jobs available.

2           The ALJ also does not appear to be entirely correct in finding plaintiff's mental limitations did not

3    significantly erode his ability to perform unskilled light work. Tr. 22.  As the First Circuit noted in Ortiz:

4           The basic mental demands of competitive remunerative unskilled work include the
            abilities (on a sustained basis) to understand, carry out, and remember simple
5           instructions; to respond appropriately to supervision, coworkers, and usual work
            situations; and to deal with changes in a routine work setting. A substantial loss of
6           ability to meet any of these basic work-related activities would severely limit the
            potential occupational base.
7
8    890 F.2d at 526 (quoting SSR 85-15, 1985 WL 56857 *4).  As discussed above, the ALJ erred in rejecting

9    the opinion of Dr. Koenig that plaintiff likely would be unable to maintain regular attendance.  While, also

10   as explained above, it is not clear that the ALJ was required to adopt that limitation, if it is determined on

11   remand that such a restriction does apply, this clearly would constitute a substantial loss of ability to meet

12   the above basic work-related activities.

13          Further, while a moderate limitation in a claimant's ability to maintain attention and concentration

14   may not necessarily significantly erode the potential occupational base in every case, see Ortiz, 890 F.2d at

15   527, such is not clear in this case.  Here, as noted above, the ALJ found plaintiff able to perform "all but

16   detailed tasks or those requiring sustained concentration." Tr. 17.  The latter restriction from performing

17   those tasks requiring sustained concentration at the very least potentially amounts to a substantial loss in the

18   ability to perform basic work-related activities.  In other words, it is not certain from the record that it

19   would have no significant effect on plaintiff's ability to perform unskilled light work.

20          In any event, given that this matter is being remanded for further administrative proceedings for the

21   other reasons set forth above, the Commissioner on remand shall re-visit the issue of plaintiff's limitation

22   vis-a-vis sustained concentration as well.  Further, to the extent the Commissioner finds the occupational

23   base for plaintiff has been significantly eroded on remand, and thus that application of the Grids alone in this

24   matter is inappropriate, the testimony of a vocational expert shall be obtained to assist in determining

25   whether or not plaintiff is capable of performing other work existing in significant numbers in the national

26   economy.

27   V.     This Matter Should Be Remanded for Further Administrative Proceedings

28          The Court may remand this case "either for additional evidence and findings or to award benefits."

     Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

1    except in rare circumstances, is to remand to the agency for additional investigation or explanation."

2    Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

3    which it is clear from the record that the claimant is unable to perform gainful employment in the national

4    economy," that "remand for an immediate award of benefits is appropriate." Id.

5         Benefits may be awarded where "the record has been fully developed" and "further administrative

6    proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

7    1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

8         (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
           evidence, (2) there are no outstanding issues that must be resolved before a
9          determination of disability can be made, and (3) it is clear from the record that the ALJ
           would be required to find the claimant disabled were such evidence credited.

10   Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because,

11   as discussed above, issues remain regarding plaintiff's physical and mental limitations, residual functional

12   capacity, and ability to perform other work existing in significant numbers in the national economy, this

13   matter should be remanded to the Commissioner for further administrative proceedings.

14                                 CONCLUSION

15        Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff was not

16   disabled.  Accordingly, the ALJ's decision hereby is REVERSED and REMANDED to the Commissioner

17   for further administrative proceedings in accordance with the findings contained herein.

18        DATED this 30th day of July, 2007.

19

20

21                                    Karen L. Strombom
22                                    United States Magistrate Judge

23

24

25

26

27

28